# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JACCARI J., a Minor, and | ) | |
| SANDRA J., Individually | ) | |
| and as Guardian and | ) | No. 08 C 6995 |
| Next of Friend of JACCARI J., | ) | |
| | ) | **Judge Ruben Castillo** |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BOARD OF EDUCATION OF THE CITY | ) | |
| OF CHICAGO, DISTRICT NO. 299, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Jaccari J. ("Jaccari"), a minor, and his guardian, Sandra J. ("Sandra") (collectively,

"Plaintiffs") bring this action against the Board of Education of the City of Chicago, District No.

299 (the "District"), alleging violations of the Individuals with Disabilities Education Act

("IDEA"), 20 U.S.C. § 1401 *et seq.*[1] (R. 1, Compl.) Pursuant to 20 U.S.C. § 1415(i)(2)(A),

Plaintiffs have filed this suit to appeal an Impartial Due Process Hearing Officer's ("IHO")

decision. (*Id.*) Presently before the Court are Plaintiffs' and the District's cross-motions for

summary judgment. (R. 45, Pls.' Mot. for Summ. J., R. 48, Def.'s Cross-Mot. for Summ. J.) For

the reasons set forth below, Plaintiffs' motion is denied and the District's motion is granted.

---

[1] Plaintiffs also named the Illinois State Board of Education ("ISBE") as a defendant.
(*See* R. 1, Compl.) On February 19, 2009, this Court dismissed ISBE from this suit without
prejudice. (R. 28, Min. Order.)

In March 2004, while in kindergarten, Jaccari was found eligible for special education services after being diagnosed with a learning disability and a speech/language impairment. (R. 54, District's Resp. Pls.' SOF ¶ 6.) Jaccari attended Wentworth Elementary School ("Wentworth") from kindergarten through first grade, where, pursuant to his Individual Education Program ("IEP") he received speech therapy and had a one-on-one aide.[3] (*Id.* ¶ 7.) His IEP also provided for placement in a "self-contained classroom," which has only children with IEPs, for all academic subjects. (*Id.*) During his time at Wentworth, Jaccari presented a number of behavioral difficulties. (*See* R. 19, Admin. R. at 280-283.)

For the 2005-06 academic year, Jaccari, then in second grade, transferred to Lawrence Elementary ("Lawrence"). (R. 54, District's Resp. Pls.' SOF ¶ 8.) Jaccari's disruptive behavior increased during this academic year. (*Id.* ¶ 9a.) On numerous occasions, he was subjected to physical restraint by his teacher and aide. (*Id.*) In May 2006, he was transferred to a regular education classroom for safety reasons. (*Id.* ¶ 9b.)

At the end of the academic year, pursuant to an IEP prepared in June 2006, Jaccari's

---

[2] The relevant facts have been culled from the following Local Rule 56.1 statements of material fact: Plaintiffs' Statement of Facts (R. 46, Pls.' SOF.), the District's Response to Plaintiffs' Statement of Facts (R. 54, District's Resp. Pls.' SOF.), the District's Statement of Additional Material Facts (R. 52, District's SOAMF. ), and Plaintiffs' Response to the District's Statement of Additional Material Facts (R. 60, Pls.' Resp. Board's SOAMF.) In addition, the Court has also used facts from the Administrative Record. (R. 19, Admin. R.)

[3] An IEP is a "written statement that maps out how a school district will provide an IDEA-compliant education" for a disabled student. *Alex R., ex. rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221*, 375 F. 3d 603, 606 (7th Cir. 2004). IEPs are developed by an "IEP team" composed of the student's parents, teachers, a representative of the local educational agency, and, whenever appropriate, the student. 20 U.S.C. § 1414(d)(1)(B).

placement was changed to a therapeutic public day school and the service of a one-on-one aide was terminated. (*Id.* ¶¶ 14a-b.) This IEP based Jaccari's eligibility for special education services on a learning disability and an emotional/behavioral disorder. (*Id.* ¶ 14d.)

Pursuant to the June 2006 IEP Jaccari transferred to Buckingham Elementary School ("Buckingham"), a public therapeutic day school for children with emotional/behavioral disorders, for the 2006-07 academic year. (*Id.* ¶ 14e.) At the end of the academic year, another IEP was developed. This IEP stated that Jaccari had a history of Attention Deficit Hyperactivity Disorder (ADHD), Oppositional Defiant Disorder (ODD), Phonological Disorder, and possible expressive receptive language disorder. (*Id.* ¶ 15.) It also provided for psychological services as well as direct social work services. (*Id.*)

By the beginning of the 2007-08 academic year, Jaccari had reached the fourth grade. (*Id.* ¶ 16.) He remained at Buckingham for this school year, but was shifted to a different classroom which changed teachers several times a day. (*Id.*) According to Buckingham staff, Jaccari continued to behave in a disruptive manner during the fall of 2007. (*Id.* ¶ 17.) For example, Jaccari would run out of the classroom, kick and bite school staff, and destroy school property. (*Id.*) Also during the fall of 2007, Jaccari began seeing Dr. Paul Haider ("Dr. Haider"), a counselor with the Chicago Family Health Center. (*Id.* ¶ 18.) Dr. Haider received reports from both Jaccari and Sandra that he was being bullied and teased by other students and that he was also having problems with teachers and staff. (*Id.*) In response, Dr. Haider wrote a letter to Buckingham's principal conveying the reports and requesting a full psychological evaluation of Jaccari. (*Id.*)

During December 2007 and January 2008, Sandra kept Jaccari home from school on most

3

days. (*Id.* ¶ 19.) The record indicates that this decision was influenced by the difficulties Jaccari was having at school. (*Id.* ¶ 20; R. 19, Admin. R. at 1928-29.) On December 3, 2007, Sandra requested, pursuant to 20 U.S.C. § 1415(f)(1)(A), a Due Process Hearing to address alleged violations of the IDEA. (R. 54, District's Resp. Pls.' SOF ¶ 21.) In her request, Sandra noted Jaccari's lack of academic success during the previous two years and stated that over the same time period he had "experienced a gradual reduction in support services, even as his behavioral disruptions and learning difficulties have increased." (R. 19, Admin. R. at 708.)

On January 30, 2008, a District psychologist administered cognitive and academic tests to Jaccari. (R. 54, District's Resp. Pls.' SOF ¶ 22.) While noting that Jaccari had a desire to learn, she found that he continued to "exhibit behavioral problems." (R. 19, Admin. R. at 628.) Moreover, her report stated that Jaccari had been "diagnosed with ADHD and has difficulties with impulsivity, lack of focus and distractibility." (*Id.*) Further, she noted that his level of cognitive ability was within the "mentally deficient range with a Full Scale IQ of 64." (*Id.*) Two weeks later, on February 14, 2008, Jaccari was tested again by a private psychologist retained by the Metropolitan Family Services, an agency that had provided counseling to Jaccari. (R. 54, District's Resp. Pls.' SOF ¶ 23.) The tests administered to Jaccari revealed that he was functioning "at less than the kindergarten grade level" in both spelling and arithmetic; his reading score, however, was at the kindergarten level. (R. 19, Admin. R. at 634.) The psychologist also concluded that Jaccari "meets the diagnostic criteria for Mild Mental Retardation." (*Id.* at 635-636.) A week after the second set of tests, a District audiologist conducted an assessment and issued a report stating that Jaccari has a "Central Auditory Processing Deficit in the area of

4

auditory integration."[4]  (*Id.* at 615.)

Near the end of February 2008, Jaccari resumed his studies at South Central Community School ("South Central"), a private therapeutic day school whose goal is to work with emotionally disturbed students to prepare them to return to a normal classroom setting.  (R. 60, Pls.' Resp. Board's SOAMF ¶¶ 3-4.)  A few months later, in May 2008, the District completed a special evaluation of Jaccari and convened an IEP meeting on May 20, 2008.  (R. 54, District's Resp. Pls.' SOF ¶ 27.)  This IEP lists emotional disturbance, mild cognitive impairment, and speech/language impairment as the basis for special services eligibility.  (R. 19, Admin. R. at 35.)

On July 3, 2008, Sandra filed a dissent outlining numerous objections to the IEP completed by the District on May 20, 2008.  (*Id.* at 1086.)  For example, Sandra asserts that the various evaluations completed or relied upon by the District to develop the IEP were either inadequate or unreliable.  (*See id.* at 1086-1089.)  Additionally, she objects to the type and intensity of reading remediation, speech language therapy, assistive technology, occupational therapy, psychological, and social work services offered to Jaccari.  (*Id.*)  Further, she contends that the IEP provided an inadequate level of related services and failed to integrate the expertise of various key staff members.  (*Id.*)

## PROCEDURAL HISTORY

In addition to the dissent, Sandra also filed an amended due process complaint on July 3, 2008.  (*Id.* at 1093.)  In her complaint, she requests a Due Process Hearing to address the District's allegedly failure to provide Jaccari with a free appropriate public education, as required

---

[4] According to the audiologist's report, auditory integration involves the ability to listen to two different stimuli at the same time.  (R. 19, Admin. R. at 615.)  Integration skills relate to a student's ability to hear a group of sounds and pull them together with other sensory information in order to make sense of a message or task.  (*Id.*)

by the IDEA, since December 2005. (*Id.*) She bases this conclusion on various allegations. First, she contends that the District failed to conduct adequate assessments of all areas of potential disability and thus developed deficient IEPs. (*Id.*) As a result, Sandra avers that the District failed to provide essential related services in the areas of assistive technology, psychological services, social work services, occupational therapy, speech language therapy, and support from a one-on-one aide. (*Id.*) Additionally, she alleges that the District did not develop an effective behavioral intervention plan and failed to "utilize properly trained staff in use of restraints." (*Id.*) Finally, she contends that the District failed to identify and utilize effective teaching methodologies at a sufficiently intensive level so as to enable Jaccari to progress commensurate with his cognitive skills. (*Id.*)

The requested Due Process Hearing convened on October 27, 2008. (*Id.* at 2.) According to a pre-hearing conference held between the parties, the issues to be addressed during the Due Process Hearing were the following:

(1)     Whether the District failed to conduct timely and adequate assessments of all areas of potential disability resulting in an educational program that did not address or inadequately addressed Jaccari's academic and emotional needs;

(2)     Whether the District failed to adequately assess Jaccari's cognitive abilities, academic skills, social/emotional needs, communication needs, central auditory processing needs and occupational therapy needs;

(3)     Whether Jaccari required and the District failed to provide him with assistive technology, school psychological service, school social work service, occupational therapy service, speech/language therapy and a one-on-one aide;

6

(4)     Whether school personnel failed to implement and record the use of appropriate physical restraint;

(5)     Whether the District failed to implement appropriate instructional methodologies in adequate intensity and/or duration to enable Jaccari to make progress commensurate with his abilities; and

(6)     Whether the District failed to provide Jaccari with adequate instruction and curricular in reading, language arts, mathematics, social studies, and science resulting in the student's failure to make academic progress.

(*Id.* at 5.) Over the course of the hearing numerous teachers, therapists, social workers, and other individuals, including Jaccari and Sandra., provided testimony. (*Id.* at 3-4.) Additionally, approximately nine-hundred pages of documents were accepted into evidence. (*Id.* at 3.) The hearing continued for five consecutive days and concluded on October 31, 2008. (*Id.* at 2.) On November 6, 2008, the IHO issued a decision in which he decided all but one issue in favor of the District.[5] (*Id.* at 2-18.)

On December 8, 2008, Plaintiffs filed the complaint in the present action appealing the IHO's decision. (R. 1, Compl.) In their complaint, Plaintiffs allege that several factual determinations made by the IHO are "contrary to the weight of the evidence and [are] based upon findings which ignore or fail to give proper weight to substantial credible evidence and/or rely on

---

[5] The IHO found that the District had failed to provide Jaccari with an occupational therapy evaluation when it had reason to believe that he may have required occupational therapy services. (R. 19, Admin. R. at 13.) He ordered the District to provide Jaccari with ten hours of occupational therapy consultation service over the ensuing five months to assist Jaccari's teacher in developing strategies to improve his writing and organizational skills. (*Id.*) He also ordered the District to provide Jaccari with thirty minutes of consultation services from the District's audiologist. (*Id.*)

7

evidence that is not credible or competent." (*Id.* ¶ 40.) Moreover, they aver that the IHO's decision should be reversed because of various legal errors. (*Id.* ¶ 41.) On February 17, 2009, Plaintiffs filed a motion to order the production of certain school records and requested leave to supplement the administrative record with the produced documents. (R. 24, Pls.' Mot. to Supplement R.) The Court granted both requests on July 23, 2009. (R. 32, Min. Order.) Plaintiffs moved for summary judgment on October 13, 2009; the District filed its cross-motion the following day. (R. 45, Pls.' Mot. for Summ. J.; R. 48, Def.'s Mot. for Summ. J.)

## STATUTORY FRAMEWORK

The IDEA "requires States receiving federal funding to make a 'free appropriate public education' (FAPE) available to all children with disabilities residing in the State." *Forest Grove Sch. Dist. v. T.A.*, 129 S. Ct. 2484, 2487 (2009) (citing 20 U.S.C. § 1412(a)(1)(A)). A FAPE is "specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Bd. of Educ. of Murphysboro Cmty. Unit Sch. Dist. No. 186 v. Illinois State Bd. of Educ.*, 41 F.3d 1162, 1166 (7th Cir. 1994) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 188-89 (1982)). To comply with the IDEA, a school district must satisfy two obligations. *See id.* First, the school district must comply with the guaranteed procedural safeguards set forth in 20 U.S.C. § 1415. *Murphysboro*, 41 F.3d at 1166 (citation omitted). Second, it must develop an IEP that is "reasonably calculated to enable the child to receive educational benefits." *Id.* Once the school district has met these two requirements, the courts cannot require more. *Id.* The purpose of the IDEA is to "open the door of public education" to handicapped children, not to educate a handicapped child to her highest potential. *Id.*

8

## LEGAL STANDARD

The standard of review in cases brought under the IDEA "differs from that governing the typical review of summary judgment." *Heather S. v. State of Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997). The IDEA provides that in reviewing the outcome of a Due Process Hearing, a court: (1) "shall receive the records of the administrative proceedings"; (2) "shall hear additional evidence at the request of a party"; and (3) "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(c). The party challenging the outcome of the administrative proceedings bears the burden of proof. *Alex R.*, 375 F.3d at 611.

On issues of law, the hearing officer is not entitled to deference. *Id.* On issues of fact, however, district courts must accord "due weight" to the decision of the hearing officer. *Id.* "The 'due weight' which the court must give to the hearings below is not to the testimony of witnesses or to the evidence–both of which the court must independently evaluate–but to the decisions of the hearing officers." *Heather S.*, 125 F.3d at 1053. Thus, because "school authorities are better suited than are federal judges to determine educational policy, the district court is required, in its independent evaluation of the evidence, to give due deference to the results of the administrative proceedings." *Beth B. v. Van Clay*, 282 F.3d 493, 496 (7th Cir. 2002).

The degree of deference depends on the amount of new evidence relied upon by the reviewing court. *See Alex R.*, 375 F.3d at 612. Where the district court does not consider any new evidence and relies solely on the administrative record, "it owes considerable deference to

9

the hearing officer, and may set aside the administrative order only if it is 'strongly convinced that the order is erroneous.'" *Id.* This level of review is akin to the clear error or substantial evidence standard. *Id.* (citation omitted). If, however, a court considers evidence that is not part of the administrative record, its level of deference to the hearing officer decreases. *Id.* In such circumstances, "although the administrative record is still part of the case and the district court therefore must not go so far as to conduct a trial de novo, less weight is due the administrative record." *Id.*

## ANALYSIS

### I.    Factual Challenges

#### A.    Jaccari's Progress

Plaintiffs first argue that the IHO "erroneously found that Jaccari made minimal progress commensurate with his abilities, although the documentary evidence in the records shows that he regressed academically in areas of math, spelling and reading over the past three years." (R. 1, Compl. ¶ 40a.) Plaintiffs point to several pieces of evidence to support their allegation that Jaccari failed to achieve progress. As background for their contention, Plaintiffs emphasize two psychological reports administered by the District. The first report, which was issued when Jaccari was in kindergarten, classified his overall intelligence as "Low Average." (R. 19, Admin. R. at 230.) In addition, they point to the testimony of a District psychologist who, after administering a standardized intelligence test, stated that Jaccari's potential for academic achievement was within the "low-average to average range." (*Id.* at 1333-36.) Given this academic potential, Plaintiffs argue that Jaccari's lack of progress on three standardized tests conducted in 2006 and 2008 indicate "negligible academic progress, or even regression in

10

spelling." The results of the standardized tests are as follows:

**Wechsler Individual Achievement Test (WIAT) administered in May 2006**

|  | Standard Score | Grade Equivalent |
|---|---|---|
| Word reading | 52 | 1st month of Kindergarten |
| Spelling | 59 | 5th month of Kindergarten |
| Arithmetic | 69 | 1st grade |

(*Id.* at 1331-33.)

**WIAT administered in January 2008**

|  | Standard Score | Grade Equivalent |
|---|---|---|
| Word reading | 64 | 5th month of Kindergarten |
| Spelling | 63 | 3rd month of Kindergarten |
| Arithmetic | 64 | 6th month of Kindergarten |

(*Id.* at 874.)

**Wide Range Achievement Test, 4th Edition (WRAT4) administered in February 2008**

|  | Standard Score | Grade Equivalent |
|---|---|---|
| Word reading | 55 | 2nd month of Kindergarten |
| Spelling | 55 | Less than Kindergarten |
| Arithmetic | 55 | Less than Kindergarten |

(*Id.* at 634.)

According to Plaintiffs, the trend in these standardized tests, examined under the backdrop of prior tests which stated that Jaccari's potential for academic achievement was within the "low-average to average range," indicate a lack of progress. Thus, they contend, the IHO erred when he found that Jaccari had achieved progress.

After an independent review of the record, the Court finds that a preponderance of the evidence supports the factual conclusion that Jaccari did achieve progress from December 2005 through the October 2008. While Jaccari's results on standardized tests are certainly less than desirable, they must be considered in the context of his intellectual and emotional impairments. Ideally, Jaccari would be performing near his grade level on standardized tests. In this case, however, the Court is faced with less than ideal circumstances. As evident in the record, Jaccari has been diagnosed with a case of "Mild Mental Retardation"; his level of cognitive ability has also been categorized in the "mentally deficient range." (*See id.* at 628, 635-36.) Given these cognitive impairments, the Court finds that standardized test scores are not the sole or dispositive indicia of progress.[6]

Other indicators evident in the record suggest that Jaccari is making progress both academically and behaviorally. Academically, for example, his May 2008 progress report notes that Jaccari was "showing improvement in his studies and putting forth effort in reading and math." (*Id.* at 63.) Indeed, this progress is further supported by his South Central teacher's testimony at the Due Process Hearing in which she noted that, in reading, Jaccari was "doing much better than [she] could ever imagine that he could." (*Id.* at 1740.) Also in his May 2008 progress report, his teacher indicates that, on the behavioral side, Jaccari had "shown great

---

[6] The Court notes that it is unpersuaded by the authority Plaintiffs cite for the proposition that the results of the WRAT4 and the WIAT examinations are comparable. (R. 57, Pls.' Mem. in Resp. to Def.'s Mot. for Summ. J. at 5.) Plaintiffs argue that the Court should find that Jaccari regressed because a comparison of his May 2006 WIAT and his February 2008 WRAT4 examinations reveal a decrease–both in standard score and grade equivalent–in both spelling and arithmetic. *Id.* The Court finds such a comparison questionable because the authority for this cross-exam comparison–a commercial website which sells the WRAT4 exam–is not particularly persuasive. *See* Psychological Assessment Resources (PAR), http://www3.parinc.com/products/product.aspx?productid=WRAT4 (last visited Jan. 25, 2010).

improvement in his attitude with staff and his willingness to cooperate with staff." (*Id.*) These indicators, along with others found in the record, suggest that Jaccari did make progress from December 2005 through the October 2008.

In sum, an independent review of the record, along with the due weight granted to the administrative proceedings below, leads the Court to conclude that Jaccari did achieve progress both academically and behaviorally.

**B.     One-on-one Aide**

Next, Plaintiffs argue that the IHO committed a factual error in "[d]etermining that the Plaintiffs submitted no evidence supporting continuation of a [one-on-one] aide, despite testimony accepted by the hearing officer that Jaccari, in his current school, is capable of working independently for only 10 minutes." (R. 1, Compl. ¶ 40b.) As a threshold matter, the Court notes that this allegation mischaracterizes the IHO's factual determination. In his decision, he did not find that Plaintiffs submitted "no evidence" in support of their request for a one-on-one aide. Rather, the IHO found that they did not "refute the testimony" of Jaccari's South Central teacher and her aide indicating that he "does not require a one-on-one aide." (R. 19, Admin. R. at 17.)

In support of their claim of factual error, Plaintiffs point to a report which indicates that a "[one-on-one] aide would be beneficial to assist him in coping with the school environment and also academics." (*Id.* at 637.) Additionally, they contend that Jaccari's South Central teacher and her aide provided "contradictory testimony" regarding his need for a one-on-one aide. (R. 57, Pls.' Mem. in Resp. to Def.'s Mot. for Summ. J. at 6.) The Court, however, finds that a preponderance of the evidence suggests that a one-on-one aide is unnecessary. First, the record

13

indicates that, in prior years, a one-on-one aide did not improve Jaccari's behavioral issues. (R. 19, Admin. R. at 130.) In addition, the testimony of two education professionals who worked directly with Jaccari at South Central indicates that a one-on-one aide would not only fail to help, but might also adversely affect his progress. (*See id.* at 1719-20, 1732.) While the Court notes that the record does indicate that Jaccari "requires a lot of one-on-one assistance to complete assignment[s] and stay on task," (*Id.* at 649), the Court finds that this piece of evidence is not dispositive in determining whether a one-on-one aide, rather than a classroom with a low student-teacher ratio, can provide the necessary assistance. Indeed, as evident in the record, Jaccari did achieve academic and behavioral progress while in a classroom with a low student-teacher ratio.

An independent review of the record, along with the due weight granted to the administrative proceedings below, leads the Court to find that Jaccari does not need a one-to-one aide.

## C. Wilson Reading System

Plaintiffs also allege that the IHO erred in accepting "the role of the [District's] 'multi-sensory coach' as a trainer for the Wilson Reading System for staff at the student's current school, despite documentary evidence" that the multi-sensory coach was not qualified to train staff in the Wilson Reading System.[7] (R. 1, Compl. ¶ 40c.) Specifically, they contend that the multi-sensory coach is unqualified to train other individuals in the Wilson Reading System because she is not a certified Wilson Reading System trainer. (*See* Pls.' Mem. in Supp. of Pls.' Mot. for Summ. J. at 16.)

---

[7] Based on the record, the Court gathers that the Wilson Reading System is a proprietary learning system which helps students read and spell words. (R. 19, Admin. R. at 1873-80.)

14

It is evident from the record that the multi-sensory coach is not a certified Wilson Reading System trainer. (R. 19, Admin. R. at 1891.) The record also indicates that to have an actual Wilson Reading System workshop, the trainer must be a certified Wilson Reading System trainer. (*Id.* at 1879.) These facts, however, are not conclusive in determining whether the multi-sensory coach was qualified to train individuals in the Wilson Reading System. The record also indicates that the Wilson Company was aware of the multi-sensory coach's efforts training teachers in the Wilson Reading System, yet permitted her to continue doing so despite the fact that she was not a certified trainer. (*Id.* at 1890.) In the absence of any evidence suggesting otherwise, the Court finds that the Wilson Company's permission to train individuals in their learning system is strong evidence that the multi-sensory coach was not unqualified.

An independent review of the record, along with the due weight granted to the administrative proceedings below, leads the Court to find that the multi-sensory trainer was qualified to train staff in the Wilson Reading System.

### D. Assistive Technology Services

As their final factual challenge, Plaintiffs argue that the IHO erred in determining "that [Jaccari] had received [assistive technology] services, when uncontradicted testimony indicated that . . . Jaccari's IEP had not been amended to incorporate recommended [assistive technology] resources and supports." (R. 1, Compl. ¶ 40d.) In addition, Plaintiffs contend that "equipment had not been provided to him" and that "his classroom lacks a computer that can be used by students," which, they argue, "is required for portions of the [assistive technology] resources." (*Id.*) The Court reads this challenge as posing two distinct issues: (1) whether Jaccari had received assistive technology services; and (2) whether he received assistive technology devices.

15

The IDEA defines assistive technology services as "any service that directly assists a child with a disability in the selection, acquisition, or use of an assistive technology device." 20 U.S.C. § 1401(2). For example, the evaluation of the needs of a disabled child, including a functional evaluation of the child in the child's customary environment, falls under this category of services. *Id.* In Jaccari's case, an assistive technology referral was issued at the May 20, 2008 IEP meeting and an evaluation was completed on October 20, 2008.[8] In her testimony at the Due Process Hearing, the District assistive technology evaluator stated that this evaluation consisted of reading, writing, and copying exercises performed at Jaccari's school. (R. 19, Admin. R. at 1796-99.) After this evaluation, she recommended the following forms of assistive technology: (1) a word prediction and talking word processing program; (2) the Earobics program; (3) an optical character recognition program and scanner; and (4) a handheld children's talking speller dictionary. (*See id.* at 1014-16, 1801.) Thus, with respect to the first issue, the record supports the conclusion that Jaccari received assistive technology services in the form of an assistive technology evaluation.

The IDEA defines assistive technology devices as "any item, piece of equipment, or product system, whether acquired commercially off the shelf, modified, or customized, that is used to increase, maintain, or improve functional capabilities of a child with a disability." 20

[8] Plaintiffs argue that the five month period between the assistive technology referral and the evaluation constitutes a violation of 105 ILCS 5/14-8.02(b). (R. 57, Pls.' Mem. in Resp. to Def.'s Mot. for Summ. J. at 7.) This statute, however, provides that the "determination of eligibility [for special education services] shall be made and the IEP meeting shall be completed within 60 school days from the date of written parental consent. In those instances when written parental consent is obtained with fewer than 60 pupil attendance days left in the school year, the eligibility determination shall be made and the IEP meeting shall be completed prior to the first day of the following school year." 105 ILCS 5/14-8.02(b). Plaintiffs' argument fails as it provides no basis for the reach of this statute, which by its terms applies to IEP meetings, extending to referrals completed at IEP meetings.

16

U.S.C. § 1401(1)(A). Here, the record indicates that prior to the October 2008 evaluation, Jaccari had access to assistive technology devices in the form of calculators, computers, and books on tape. (*Id.* at 37-38, 847-48.) While the Court notes that Jaccari did not have access to a computer in his classroom, he did have access to a computer room that was available for use when deemed necessary by his teacher.[9] (*Id.* at 1733-34.) The Court therefore finds that Jaccari had access to assistive technology devices.

An independent review of the record, along with the due weight granted to the administrative proceedings below, leads the Court to find that Jaccari received assistive services and devices.

## II.     Legal Challenges

### A.     Procedural challenge

Plaintiffs argue that the District's alleged failure to "record data, in either paper or electronic form, for dozens is not scores of incidents involving behavioral problems, disciplinary incidents and use of physical restraints amounts to a procedural violation" of the IDEA that denied Jaccari a FAPE. (R. 47, Pls.' Mem. in Supp. of Pls.' Mot. for Summ. J. at 27-28.)

The IDEA requires local educational agencies to establish and maintain procedures to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a FAPE by such agencies. 20 U.S.C. § 1415(a). The statute sets forth

---

[9] It is unclear from the record whether these devices have actually been provided to Jaccari. According to the assistive technology evaluator, it takes approximately one to two weeks after the issuance of the report for the requested resources to be provided. (*See* R. 19, Admin. R. at 1802.) Given the short amount of time between the evaluation and the Due Process Hearing, it does not appear as if the District had provided Jaccari with the requested resources prior to the Due Process Hearing. (*See id.* at 8.) Plaintiffs have not supplemented the record with any evidence indicating that the District has not provided the resources recommended in the October 2008 assistive technology evaluation.

17

a number of procedural safeguards that must be established by local educational agencies. For example, parents are entitled to examine all of their child's records, participate in placement meetings, and receive written notice of proposed changes in placement. *See* 20 U.S.C. § 1415(b). A school district's failure to comply with the IDEA's procedural requirements, however, does not require a finding of a denial of a FAPE. *Hjortness ex rel. Hjortness v. Neenah Joint Sch. Dist.*, 507 F.3d 1060, 1065 (7th Cir. 2007). Such a finding is only appropriate if the procedural inadequacies: (1) impeded the child's right to a free appropriate public education; (2) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (3) caused a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii).

While Plaintiffs argue that the District's alleged failure to properly record disciplinary incidents involving Jaccari constitutes a procedural violation of the IDEA, they fail to cite any portion of the statute or its implementing regulations which require the type of documentation they request. (*See* R. 47, Pls.' Mem. in Supp. of Pls.' Mot. for Summ. J. at 27-28; R. 61, Pls.' Reply. in Supp. of Pls.' Mot. for Summ. J. at 11.) Absent any statutory or regulatory provision requiring such documentation, the Court cannot find that the District committed a procedural violation of the IDEA.

## B.     Substantive challenges

### 1.     FAPE

Next, Plaintiffs argue that the IHO's decision should be overturned because, in mistakenly applying a "minimal progress standard," the IHO "erroneously concluded that the District provided Jaccari a free and appropriate education despite uncontradicted testimony and

18

documentary evidence that the student regressed academically and did not meet certain IEP goals." (R. 1, Compl. ¶¶ 41a-b.) While they present their contention as two separate challenges, Plaintiffs are essentially arguing that the IHO erred in finding that the District provided Jaccari with a FAPE. To determine whether the District failed to satisfy the IDEA's substantive requirement, the question the Court must answer is whether Jaccari's IEPs were "reasonably calculated to enable [him] to receive educational benefits."[10] *Murphysboro*, 41 F.3d at 1166 (citation omitted).

An IEP is reasonably calculated to confer educational benefits when it is "likely to produce progress, not regression or trivial educational advancement." *Alex R.*, 375 F.3d at 615 (citations omitted). The degree of progress required by the IDEA depends on the student's abilities. *Id.* ("while one might demand only minimal results in the case of the most severely handicapped children, such results would be insufficient in the case of other children"). While the IDEA seeks to promote educational progress, it does not generate an additional requirement that the services provided to disabled students be sufficient to maximize each child's potential commensurate with the opportunity provided to other children. *Rowley*, 458 U.S. at 198. Rather, the IDEA provides a "basic floor of opportunity" which "consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Id.* at 201; *Hjortness*, 507 F.3d at 1064. Federal courts, however, have

---

[10] The IDEA provides that a "parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law." 20 U.S.C. § 1415(f)(3)(C). Here, because Plaintiffs file their initial due process complaint on December 3, 2007, the Court can properly consider the District's alleged actions which form the basis of the complaint dating back to December 3, 2005.

19

recognized that a school does not satisfy the IDEA by offering "mere token gestures or a trifle." *Nein v. Greater Clark County Sch. Corp.*, 95 F. Supp 2d 961, 973 (S.D. Ind. 2000) (citations omitted). In determining whether an IEP is reasonably calculated to confer an educational benefit, the Court will consider the following factors: (1) the child's potential; (2) whether his IEPs were tailored to his unique needs; (3) whether his IEPs provided access to specialized services; (4) whether they addressed disability-related disruptive acts; and (5) whether the child achieved progress during the relevant time period.[11]

### a. Child's potential

To determine the whether a district has complied with the IDEA's substantive requirement, the educational benefit provided to the child "must be gauged in relation to the child's potential." *Id.* at 974. Because of the importance of this determination, the parties in this case vigorously dispute this issue. According to Plaintiffs, Jaccari is a student of "low-average to average cognitive skills." (R. 57, Pls.' Mem. in Resp. to Def.'s Mot. for Summ. J. at 10.) Given this level of cognitive skill, Plaintiffs argue that Jaccari's poor performance on standardized tests indicate that the District is failing to provide him with a FAPE. In contrast, the District emphasizes portions of the record indicating that Jaccari is cognitively impaired. (R. 43, Def.'s Mem. in Supp. of its Mot. for Summ J. at 21-22.) Therefore, they contend, Jaccari's standardized test scores cannot be the sole or dispositive indicators of progress.

In support of their characterization of Jaccari's potential, Plaintiffs point to a March 2004

---

[11] This inquiry examines the IEP at the time of its implementation and not in hindsight. *See JG v. Douglas County Sch. Dist.*, 552 F.3d 786, 801 (9th Cir. 2008) ("We consider the IEP at the time of its implementation, not in hindsight, and ask if its methods were reasonably calculated to confer an educational benefit on the child."); *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1040 (3d Cir. 1993) ("the measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date").

psychological evaluation which classified Jaccari's overall level of intelligence as "Low Average." (R. 19, Admin. R. at 230.) Additionally, they emphasize the testimony of a school psychologist who, based on a standardized intelligence test she conducted in May 2006, stated that Jaccari's potential for achievement was in the "low-average to average" range. (*Id.* at 1336.) The Court finds that these pieces of evidence are outweighed by other portions of the record indicating that Jaccari possesses below average cognitive skills. First, the aforementioned school psychologist also testified that the composite IQ score of 66 identified in the May 2006 test would fall in the "mild cognitive impairment range" and that Jaccari's "achievements would be commensurate with [his] overall IQ level." (*Id.* at 1345-46.) Two subsequent psychological reports further support the May 2006 findings. A psychological evaluation conducted on January 30, 2008 indicates that his level of cognitive ability is "within the mentally deficient range with a Full Scale IQ of 64." (*Id.* at 628.) Further, another psychological evaluation administered on February 14, 2008 diagnosed Jaccari as suffering from "mild mental retardation" and also noted "cognitive deficits." (*Id.* at 636.) While Plaintiffs make much of the disparity between Jaccari's verbal and non-verbal scores on the May 2006 exam and the timing of the January and February 2008 examinations, their attempts to undermine the evidence fail to persuade the Court that Jaccari is a student of average intellectual potential who should be performing in the vicinity of his grade level on standardized tests. Thus, based on the preponderance of evidence in the record, the Court finds that Jaccari possesses below average academic potential.

### b. Tailored to student's unique needs

Next, the Court will look at whether Jaccari's IEPs were tailored to his unique needs. *See Rowley,* 458 U.S. at 181. The Court notes that each of Jaccari's IEPs were developed by a group

21

of professionals from various disciplines. (*See* R. 19, Admin. R. at 737, 778, 809, 840.) In each IEP, the District sets out a series of measurable annual goals and quarterly benchmarks which are tailored to Jaccari's level of academic performance. (*See, e.g., id.* at 744-50.) Additionally, each IEP contains various modifications and accommodations designed to help Jaccari participate in the general education curriculum. (*See, e.g., id.* at 743, 784, 815, 848.) For example, his 2005-06 IEP notes that Jaccari should be provided with "picture clues for assignments" and should be provided with "visual & audio instructions daily." (*Id.* at 743.) Further, each IEP contains a Functional Analysis and Behavior Intervention Plan that outlines the behavioral difficulties posed by Jaccari and identifies potential effective interventions on the part of school staff. (*Id.* at 757, 803, 829, 860.) Finally, the yearly changes evident in his IEPs and his placement at both Buckingham and South Central–both therapeutic day schools for children with emotional/behavioral disorders–indicate that the District was attempting to respond to Jaccari's needs. After a review of the relevant IEPs, the Court finds that they were tailored to Jaccari's unique needs.

### c.    Access to specialized services

The Court must also consider whether Jaccari's IEPs provided a "basic floor of opportunity" by granting him "access to specialized instruction and related services" which were individually designed to provide him with an educational benefit. *See Rowley*, 458 U.S. at 201. Based on the record, the Court finds that Jaccari's IEPs provided him with access to individualized specialized instruction. In each of his IEPs, Jaccari was provided with a

22

significant number of special education and related services minutes.[12] His 2005-06 IEP provided 1,260 minutes–out of a possible 1,500 minutes–per week of specialized instruction provided in a separate classroom. (R. 19, Admin. R. at 751.) The IEPs for the following three academic years increased the amount of minutes of specialized instruction to 1,500 minutes per week. (*Id.* at 791, 825, 863.) Given his documented behavioral issues, these minutes were provided in a separate setting with a low student-teacher ratios. (*Id.* at 792, 825, 863.) In addition, given these same behavioral issues, these services were provided in an environment without non-disabled peers. (*Id.*) The Court therefore finds that the District considered Jaccari's individual characteristics in developing his IEPs and provided him access to specialized instruction and related services.

### d. Addressed disability-related disruptive acts

In its analysis, the Court must also consider whether Jaccari's IEPs responded "to all significant facets of the student's disability, both academic and behavioral." *Alex R.*, 375 F.3d at 613 (citation omitted). The Seventh Circuit has noted that an "IEP that fails to address disability-related actions of violence and disruption in the classroom is not 'reasonably calculated to enable the child to receive educational benefits.'" *Id.* Under this factor, the Court must examine whether a student's IEP considered whether the student's "behavior impedes his or her

---

[12]    The IDEA defines related services as "transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children." 20 U.S.C. § 1401(26)(A).

learning or that of others" in the classroom. *Id.* Here, all of his IEPs note that one of Jaccari's

disabilities is an emotional disturbance. (R. 19, Admin. R. at 740, 781, 812, 845.) In Jaccari's

case, this emotional disturbance contributed to many of the behavioral issues he was having at

school. (*See, e.g., id.* at 748-49.) In all four of the relevant IEPs, Jaccari's behavioral issues

were considered by the IEP team. (*See id.* at 757, 803, 829, 860.) For each IEP, a Functional

Analysis and Behavior Intervention Plan was developed to identify inappropriate behaviors,

potential causes of those behaviors, and planned restrictive and nonrestrictive interventions. (*Id.*)

In response to Jaccari's behavioral issues, the District decided to provide Jaccari with specialized

services outside of a regular classroom.

Plaintiffs argue that the District's failure to manage Jaccari's "aggressive and violent

behavior" should lead this Court to conclude that Jaccari was denied a FAPE. (R. 47, Pls.' Mem.

in Supp. of Pls.' Mot. for Summ. J. at 29.) Their argument fails to persuade the Court as they do

not mention exactly how the District failed to manage these behaviors and, as a result, did not

provide Jaccari with a FAPE. (*See id.*) While they seem to suggest that the behavioral

interventions utilized by the District were not reasonably calculated to provide Jaccari with an

educational benefit, they do not provide any indication as to what interventions they find

objectionable.[13] (*See* R. 57, Pls.' Mem. in Resp. to Defs.' Mot. for Summ. J. at 12.) Thus, the

Court finds that the District did address and manage the behavioral issues stemming from

---

[13] In their amended due process complaint, Plaintiffs allege that the District "failed to
utilize properly trained staff in the use of restraints." (R. 47, Pls.' Mem. in Supp. of Pls.' Mot.
for Summ. J. at 20.) To the extent Plaintiffs implicitly incorporate this argument to support their
claim that behavioral interventions utilized by the District were not reasonably calculated to
provide Jaccari with an educational benefit, the Court finds that Plaintiffs have failed to point to
any portion of the record which indicates that the District failed to train its staff in the proper use
of restraints.

24

Jaccari's emotional disturbance.

### e. Progress

Finally, the Court must consider Jaccari's progress during the relevant time period. *See Alex R.*, 375 F.3d at 615. While an IEP must be examined at the time of its implementation, *see Douglas County*, 552 F.3d at 801, whether a student achieved progress under an IEP can shed light upon whether the District's efforts were reasonably calculated to confer an educational benefit. *James D. v. Bd. of Educ. of Aptakisic-Tripp Cmty. Consol. Sch. Dist. No. 102*, 642 F. Supp. 2d 804, 826 n.17 (N.D. Ill. 2009). In arguing that Jaccari did not progress during the relevant time period, Plaintiffs rely heavily on Jaccari's less than desirable results on standardized test scores. (*See* R. 47, Pls.' Mem. in Supp. of Pls.' Mot. for Summ. J. at 26-27.) As noted above with respect to their first factual challenge to the IHO's decision, Jaccari's failure to increase his standardized test scores is not dispositive in determining whether he made progress. Given his cognitive impairment and emotional disturbances, it is unclear what he should be scoring on standardized tests and how much of a yearly increase in his scores should be expected.[14] What is clear, however, is that other indicators suggest that Jaccari is making progress. For example, in May 2008, he achieved his language arts benchmark goal and would have met his math goal "if he put forth a little more effort." (R. 19, Admin. R. at 64.) These results are representative of Jaccari's general upward progress in satisfying his quarterly

---

[14] Jaccari's cognitive impairments and emotional difficulties render Plaintiffs' reliance on *Kevin T. v. Elmhurst Community School District No. 205*, 2002 WL 433061 (N.D. Ill. Mar. 20, 2002) unpersuasive. In *Kevin T.*, the court found that the plaintiff's IEPs were not reasonably calculated to confer an education benefit upon him because, despite his average intellectual potential, his IQ and academic achievement scores decreased dramatically over the relevant time period. 2002 WL 433061, at *11. Here, in contrast, the record indicates that Jaccari possesses below average intellectual potential.

benchmarks for his academic subjects. (*Compare id.* at 744-750 *with* 785-790.) Behaviorally, Jaccari has also taken positive steps. While in prior years Jaccari would behave violently in class, a progress report issued in April 2008 indicates that he is well-mannered and "does not bother other children." (*Compare id.* at 523 *with* 66.) Considering this progress, along with the previously discussed factors, the Court finds that Jaccari's IEPs were reasonably calculated to confer an educational benefit.

While admittedly enjoying the benefit of hindsight, the Court is troubled by, among other things, the fact that Jaccari's cognitive impairment was first formally noted in his 2008-09 IEP. (*Compare* R. 19 Admin. R. 19 at 740, 781, 812 *with* 843.) Had this condition been identified earlier, perhaps the District could have provided Jaccari with a mix of services that may have helped him achieve much more progress. Under the law, however, the Court's task is not to speculate or to second-guess the decisions made by educators and conceive of ways in which the school district could have done a better job. Rather, what the IDEA requires this Court to determine is whether the District has provided Jaccari with "an appropriate education, not the best possible education." *Heather S.*, 125 F.3d at 1057 (citations omitted). Accordingly, based on the record before it, the Court finds that the District has provided Jaccari with a FAPE.

### 2. Evaluations

Plaintiffs also contend that the IHO "erroneously determined that evaluations, with the exception of occupational therapy, had been provided in a timely manner and had adequately covered all areas of suspected disability, despite substantial evidence that tests were not completed in a timely manner, and that [s]peech language, academic assessments, occupational therapy evaluations had omitted assessing areas of suspected disability." (R. 1, Compl. ¶ 41d.)

26

The Court reads this challenge as presenting two distinct issues. First, Plaintiffs challenge the timeliness of the evaluations conducted by the District. Second, they question the adequacy of the evaluations.

The IDEA provides that "[e]ach local educational agency shall ensure that . . . the child is assessed in all areas of suspected disability." 20 U.S.C. § 1414(b)(3)(B). When such an assessment is made in the context of a reevaluation, the statute states that it take place not more frequently than once a year unless the parent and the local educational agency agree otherwise. 20 U.S.C. § 1414(a)(2)(B). The statute, however, does require that such an evaluation take place at least once every three years, unless the parent and the local educational agency agree that a reevaluation is unnecessary. *Id.*

Here, Plaintiffs contend that the evaluations conducted by the District were untimely. (R. 57, Pls.' Mem. in Resp. to Defs.' Mot. for Summ. J. at 13.) They fail, however, to provide any argument as to which specific evaluations were untimely and why, based on the IDEA's requirements, they were unlawfully late. (*See* R. 47, Pls.' Mem. in Supp. of Pls.' Mot. for Summ. J. at 33-36.) Plaintiffs' undeveloped arguments regarding the timeliness of Jaccari's evaluations thus fail to persuade the Court.

Additionally, Plaintiffs claim that the evaluations performed by the District were inadequate. (*Id.*) Specifically, they argue that Jaccari's speech, academic, and occupational therapy evaluations failed to address areas of suspected disability and thus violated the IDEA. (*See* R. 1, Compl. ¶ 41d.) With respect to Jaccari's speech evaluation, Plaintiffs argue that it was deficient because "it lacked formal assessments of articulation, phonological skills and language processing skills." (R. 47, Pls.' Mem. in Supp. of Pls.' Mot. for Summ. J. at 34.) The Court

finds this contention unpersuasive. While the speech pathologist who evaluated Jaccari did not conduct formal assessments in these areas, she did gather the information she needed in an informal manner. (R. 19, Admin. R. at 1446.) Because of difficulties she was having with Jaccari in conducting formal assessments, she applied a speech pathologist "best practice" and gathered information informally to complete her evaluation. (*Id.*) The Court will not second-guess the evaluative methodologies of an experienced speech pathologist.[15]

Plaintiffs also claim that Jaccari's occupational therapy evaluation was inadequate because it "did not assess visual motor skills and sensory impairments that were observed by his current occupational therapist." (R. 47, Pls.' Mem. in Supp. of Pls.' Mot. for Summ. J. at 34.) First, the Court notes that Jaccari's May 2008 occupational therapy evaluation did examine his visual motor skills. (*See* R. 19, Admin. R. at 638-41.) Second, while this evaluation did not assess the sensory impairments observed by his current occupational therapist, the statute does not require testing in every conceivable area of disability. *See* 20 U.S.C. § 1414(b)(3)(B). Rather, it only requires assessments in all areas of suspected disability. *Id.* Plaintiffs point to nothing in the record indicating that the District suspected that Jaccari had sensory processing difficulties prior to the May 2008 evaluation. Thus, Plaintiffs' claim regarding the adequacy of

---

[15] Plaintiffs also allege that Jaccari's academic assessments were deficient. (R. 1, Compl. ¶ 41d.) In their briefs, they fail to provide any argument regarding the alleged deficiencies in academic assessments. (*See* R. 47, Pls.' Mem. in Supp. of Pls.' Mot. for Summ. J. at 33-35; R. 61, Pls.' Reply. in Supp. of Pls.' Mot. for Summ. J. at 12-13.) Thus, this challenge also fails.

Jaccari's occupational therapy evaluation also fails.[16]

In summary, the Court finds that the record does not establish that the evaluations provided to Jaccari were either untimely or inadequate. Thus, a preponderance of the evidence indicates that the District satisfied its duty under IDEA.

### 3. Compensatory Services

Finally, Plaintiffs argue that the IHO "erroneously refused to order compensatory education services to assist Jaccari to recover lost educational opportunities" that they allege Jaccari suffered during the two previous years. (R. 1, Compl. ¶ 41e.) They contend that as a result of these lost educational opportunities, the District should provide Jaccari with two-hundred hours of tutoring in reading, social work and/or psychological counseling for one hour per week for two years, speech language services for one hour per week for two years, and a one-on-one aide through the school day for at least one year. (*Id.* at Ex. B at 2-3.)

Compensatory services are well-established as a remedy under the IDEA. *Evanston Cmty. Consol. Sch. Dist. No. 65 v. Michael M.*, 356 F.3d 798, 803 (7th Cir. 2004). The language of the IDEA, which allows courts to "grant such relief as [it] determines is appropriate," confers broad discretion to district courts in constructing remedies. 20 U.S.C. § 1415(i)(2)(C)(iii); *School Comm. of Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369 (1985). The statute,

---

[16] Plaintiffs also argue that the District's cognitive and assistive technology evaluations were flawed. (R. 47, Pls.' Mem. in Supp. of Pls.' Mot. for Summ. J. at 34-35.) While they present reasons for disagreeing with various aspects of these evaluations, they do not set forth any argument as to how these disagreements constitute violations of the IDEA or its implementing regulations. (*Id.*) The Court also notes that Plaintiffs' reliance on *Independent School District No. 701 v. J.T.*, 2006 WL 517648, at *10-11 (D. Minn. Feb. 28, 2006) is misplaced. Plaintiffs cite the case for the proposition that a "parent is entitled to an independent educational evaluation upon a showing of inadequacy in the school district's evaluation," but fail to recognize that the relevant portion of the case involves a regulation—34 C.F.R. § 300.502—that is not at issue here.

however, limits such relief to that which is appropriate. *Burlington*, 471 U.S. at 369. Whether relief is considered appropriate is examined in light of the purpose of the IDEA, which is "principally to provide handicapped children with 'a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." *See id.*

In this case, the Court has found that the District has provided Jaccari with a FAPE. Through its efforts designing IEPs and altering Jaccari's placement to suite his particular needs, the Court has determined that the District's efforts were reasonably calculated to confer an educational benefit. Thus, the Court concludes that ordering the District to provide the requested compensatory services would not be appropriate.

## CONCLUSION

For the foregoing reasons, the Plaintiffs' motion for summary judgment (R. 45) is DENIED and the District's motion for summary judgment (R. 48) is GRANTED.

Entered:

Judge Ruben Castillo
United States District Court

Dated: February 23, 2010

30